## Nettis, Appellant, v. General Tire Company of Philadelphia, Inc.

Argued January 9, 1935. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Frank J. Eustace, Jr.,* of *Wilson & McAdams,* for appellant.

*S. S. Herman,* of *Herman & Harris,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, February 4, 1935:
Plaintiff appeals from the judgment entered on an instructed verdict for defendant in an action of trespass for

negligence. The questions raised are interesting and challenge thoughtful consideration, but we are of opinion the judgment should be affirmed.

Defendant is a manufacturer and vendor of tires and, perhaps, other automobile accessories. One of its places of business was a two-story building located at the northeast corner of Broad and Poplar Streets in the City of Philadelphia. It used the first story for the sale of its products, and the second story for the necessary clerical work in connection with its business. It was but a tenant of the property, becoming so long after the building was constructed, and continuing as such until at and after the time of the accident.

Shortly after it became a tenant, defendant entered into a contract with the Brener Window Cleaning Company, to clean the windows of the building at stated intervals for a specified consideration. How the work was to be done was not stated, that matter being left entirely to the expert judgment of the cleaning company, which was, therefore, an independent contractor: Colleoni v. Delaware & Hudson Co., 274 Pa. 319. On March 2, 1932, that company sent an expert window cleaner to clean the second-story windows of the property. It does not appear that he made any inquiries regarding the manner of doing the work, or even that any one authorized to speak for defendant even knew of his presence until after the accident hereinafter referred to. In addition to the tools to be used by him in cleaning the windows, he took, also, what is known as a "safety belt," that is a belt which is intended to pass back of a man standing on the window sill outside of the sash, and to be attached on each side, when in use, to a hook or bolt permanently affixed to the window frame or to the adjoining wall. Such an apparatus is quite common in tall buildings, but is rarely used in those which are but two or three stories high. Being but two stories high, the building occupied by defendant was not equipped for the use of that device, and plaintiff

therefore sent the belt back and proceeded to do his work without it.

He cleaned a number of windows without any accident occurring, and finally came to the one where he was hurt. This was one of a nest of three, that is three windows of two sashes each, grouped together, in a single frame, each upper sash being on the outside. Each sash was 42 inches high by 33 inches wide, and fitted snugly when the sash was at the top of the frame, but had one-eighth of an inch play when at the bottom. The sill of the windows was 7 inches wide when the sashes were in place, and the standing place thereon was, consequently, about two inches narrower when the upper sash was drawn down to the sill.

When plaintiff came to this window for the purpose of cleaning the glass, he had, under the way the building was constructed, the choice of four ways of proceeding to do so. He could have worked from a ladder resting upon the street pavement and running up to the window; or he could have sat on the sill with his legs and feet inside of the room; or he could have worked from a swinging scaffold, hanging down from the roof; or he could have stood on the narrow sill and taken the chance of a fall therefrom. He chose the last named, which, as his experience must have told him, was by far the most dangerous way. He gave no reason for selecting it in preference to the third method, but deemed it preferable to either of the first two because an "even finish" to the window panes could not be obtained if either of them was adopted. Assuming this to be so, he is, of course, to be commended for desiring to do his work in such a way that it would look best when completed; but the risk involved in such a choice was his and not defendant's, whose contract did not require an "even finish" to the work, and who, having itself no expert knowledge on the subject, left to his expert employer the choice of the method of performance, and the latter, so far as appears, left that choice to plaintiff, who was himself an expert workman.

In the performance of the work, he stood in the second-story room, raised the lower sash, climbed out under the two sashes and stood on the narrow sill, holding on to the upper sash. At that time there was ample standing room, for the back part of his feet could rest on the sill, and the front part project into the room. When, however, he pulled the upper sash down to the sill in order to clean it, he had to draw back his feet so that his toes would be clear of the sash, and a large part of the foot, at and adjoining the heel, would project outside of and beyond the sill with nothing to rest upon. This necessarily left him in an unbalanced position, and only his holding on to the upper sash, which he was lowering, saved him from then falling over backwards.

When the sash was at or near to the sill, for some reason which both sides admit they cannot explain, the upper sash pulled entirely out from the window frame, and, as plaintiff lost his balance while holding on to the sash, his weight dragged the sash-cords out of their sockets in the sash, and, there being nothing else to hold up the sash, both he and it fell to the pavement, where he received the injuries of which he complains in this suit.

Admittedly, defendant had nothing to do with the construction or placing of the frame or the sash, which when in place looked entirely safe, and like every other window; and admittedly, also, none of the woodwork connected with either the frame or the sash was splintered or broken as the result of this accident. There would seem, therefore, to be no explanation of the cause of the sash coming out of its place in the frame, unless it was that, by reason of the unusual strain put upon it by plaintiff, it buckled in the center and thus became shorter in a straight line across from side to side, on the inside of the sash, than the distance between the beads, which formed part of the window frame, and were intended to keep the sash in place.

The sash was not intended to be used in the way plaintiff used it, and hence, since the accident was the direct

result of such an improper use, defendant, who had no reason to anticipate it, cannot be held liable for the resulting injury, unless there is something in the relation of the parties, and the law relating thereto, which makes inapplicable the ordinary rules applicable to actions of negligence.

An examination of the relevant authorities elsewhere shows that they are hopelessly conflicting. An elaborate note in 44 American Law Reports, from page 904 to page 1134, proves this to be so. One line of cases, frequently applied in other jurisdictions, holds that an owner owes to the employees of an independent contractor precisely the same duty, in matters of this kind, that the independent contractor himself does to them. To this we do not agree (Rugart v. Keebler-Weyl Baking Co., 277 Pa. 408) ; this character of liability is based on the contract between the contractor and his employees, and their duty to comply with his directions in regard to their work. Another line, perhaps quite as long, holds the owner liable only in case he attempts to direct the method in which the work shall be done. This error is, perhaps, as far wrong on the other side of the picture.

It is not necessary, however, to pursue the subject further, so far as respects the legal status of the parties in other jurisdictions, since the legal question involved in this case can readily be stated from our own recent decisions, though it must be admitted some of the earlier ones left much to be desired. "It is the rule that the owner of property owes to an independent contractor and his servants at work thereon the duty of exercising reasonable care to have the premises in a safe condition for the work, unless the defects responsible for the injury were known to the contractor. The owner is not charged with the absolute duty of having the premises safe; his duty is discharged by the exercise of reasonable care. All the authorities agree that it is incumbent upon the owner of premises upon which persons come by invitation, express or implied, to maintain such premises in a reason-

ably safe condition for the contemplated uses thereof and the purposes for which the invitation was extended": Newingham v. J. C. Blair Co., 232 Pa. 511; Craig v. Riter-Conley Mfg. Co., 272 Pa. 219. An owner of a building owes no statutory duty to the employee of a contractor, in order to guard against injury to the employee, to instruct him as to the dangers of the employment, or to give him a reasonably safe place in which to work. While the owner in such a case is required to use reasonable care to guard the employees against injury, he will not be liable where causes of the injury intervened which he neither did nor could expect: Rugart v. Keebler-Weyl Baking Co., 277 Pa. 408. "An owner of a building is not liable for injuries to a servant or to a person lawfully upon his premises by reason of latent defects of which he was ignorant and which could not have been discovered by the exercise of reasonable care and diligence": Lentz v. Allentown Bobbin Works, 291 Pa. 526. "An occupier of premises owes to business invitees the affirmative duty of [exercising reasonable care in] keeping his premises reasonably safe, and of giving warning of any failure to maintain them in that condition": Kulka v. Nemirovsky, 314 Pa. 134.

In this state of the law, what was defendant's duty, and wherein, if at all, did it breach that duty? Knowing that it had no expert knowledge on the subject, it made a contract with one who had that kind of knowledge. It had the right to expect that the work would be performed in the way an expert would do it, and that the independent contractor's employees, sent to do it, would be given the benefit of their employees' expert knowledge. The employee who was sent was an expert in that kind of work. What, if anything, his employer told him regarding it, does not appear. Of his own motion he chose the most dangerous method of performance and put upon the window sash a stress too great for it to stand, and one for which it was never intended. As a result it pulled out for a reason no one can explain even yet. The defect in the

sash or frame, whichever it was, was on the outside of the building, where it could not be seen. Defendant was not responsible for the defect; it was caused by the owner of the building, the contractor for its erection and construction, or the mill man who made the frame and the sash. Of it defendant knew nothing, and the most meticulous care in inspecting the premises before the work was begun would not have disclosed it. It follows that there was no breach of duty on defendant's part, as defined in our authorities above quoted, and hence, from this standpoint also, under the facts as hereinbefore set forth, defendant cannot be held liable.

It is said, however, that there was evidence that, before this accident, the same sash had pulled out when another person was starting to clean the window, and he and one other witness testified to having told two of defendant's employees that one of the windows was not safe. So far as appears, these two persons were not officials of defendant to whom such a notice should have been given in order to bind the defendant. One was a salesmanager, in charge of the sales of tires on the first floor, and the other was the cashier and bookkeeper of defendant.

There was evidence by one of these witnesses that he went "down to the first floor to the man that *I thought* was in charge," and told him of the pulling out of the window; and again, speaking of this person, he said *"He seemed to be the general salesman* around there." Neither of these opinions, for that is all they were, was of the slightest weight in determining who was in charge of defendant's business at that place. In fact the uncontradicted evidence was that one J. S. McEntee, who had an office in the second story, was the person in charge.

Finally, it is contended that the 15th assignment of error discloses error. It sets up that a paper was presented to a witness and he was asked: Q. Will you tell us what that paper is? This was objected to, and was overruled for the obvious reason that the paper spoke for itself.

The judgment of the court below is affirmed.