## Evans v. Younkin

536

Before Gibson, J., twenty-seventh judicial district of Pennsylvania, specially presiding; and Dumbauld and Carr, JJ.

*Edward D. Brown,* for plaintiff.

*F. E. Younkin* and *Dean D. Sturgis,* for defendant.

*Opinion and order*

DUMBAULD, J., March 7, 1938.—In this trespass action wherein it is contended that defendant negligently caused the death of plaintiff's husband, the trial judge submitted to the jury three questions: (1) Was the defendant negligent? (2) was the plaintiff's deceased husband negligent? and (3) were the injuries incurred by the plaintiff's deceased husband, which were inflicted upon him, on May 24, 1935, the proximate cause of his death, on October 9, 1935?

The jury in a verdict for plaintiff, answered questions (1) and (3) in the affirmative.

In defendant's brief, in support of motion for judgment n. o. v., and also for a new trial, it is earnestly insisted that there is no evidence to justify the submission

of any of these questions. The learned counsel for defendant state the question involved as follows:

1. The plaintiff's own testimony disclosed that the plaintiff's decedent was guilty of contributory negligence as a matter of law.

2. There was no proof that defendant was negligent or that, if negligent, such negligence was the proximate cause of the death of decedent.

3. There is no proof of any causal connection between the alleged accident and plaintiff's decedent's death.

We have reviewed the case in considerable detail and are not convinced that there was error in submitting these questions to the jury. We conclude that the evidence applicable to each of these questions is of such a character as to require determination thereof by the jury as a question of fact and not by the court as a matter of law.

The injury to plaintiff's husband occurred on May 24, 1935, at defendant's place of business, in the City of Connellsville, between 9:30 and 10 o'clock a.m.

Defendant at that time was operating a wholesale produce business. For that purpose he occupied a two-story brick building, described in detail in plaintiff's Exhibit No. 1. This blue print, and photographs identified as defendant's exhibits A, B, and C, disclose the location of the trap door through which plaintiff's decedent fell.

This building occupied by defendant as his place of business faces approximately south on Grape Alley. It consists, as to the part in question, of a wareroom or storeroom which occupies the central and western part of the building, with the exception of an office in the extreme western end of the building in the south. The regularly established entrance for people desiring to go into the produce house is from Grape Alley near the west end of the building, and is by a pair of steps leading from the street to the storeroom or wareroom. Leading from the street on the eastern side of the building, space is provided by which a truck may back in to a loading plat-

form. This loading platform is about two and three-fourths feet above the level of the street and is constructed of concrete. This loading platform is arranged so as to be practically flush with the bottom of the bed of an ordinary truck backed into the space.

Back of the loading platform is a room known as a cooler. This room extends from the north of the loading platform to the rear of the building and extends toward the west to approximately the middle of the building.

At the west end of the loading platform is a trap door. This trap door is 3.6 feet in length and 2.4 feet in width. When closed, this trap door is flush with the level of the loading platform. It is hinged at its north end and when raised or opened, swings back and rests against the wall of the room known as the cooler. The western end of this trap door is in line with the eastern wall of the wareroom. A door hinged so as to swing back toward the cooler room is located immediately west of the trap door and when closed is in line with the inside wall of the wareroom.

This trap door gives access to a portion of the basement known as the banana room. The distance from the trap door to the floor of the banana room is 7.8 feet. From the office door on the west side of the building to the trap door is 27 feet. A pair of scales is located in the wareroom near steps leading to the basement. The loading platform is approximately 9.4 feet long and 5.5 feet wide.

About 2 feet 6 inches east of the trap door an electric light is suspended from the ceiling. The bulb or globe is approximately 6.4 feet above the level of the loading platform. Another electric light is located in the wareroom approximately 10 feet from the door leading into the loading platform. The size or intensity of these lights is not disclosed. A door 4 feet wide opening toward the loading platform leads into the cooler room. No windows are in the walls surrounding the loading platform.

Every portion of this floor of this building was in use by defendant in the operation of an extensive wholesale produce business. In the office defendant met customers in person, and over the telephone, located therein, a large portion of the business was conducted. The large ware-room or storeroom was used in various ways. The scales for weighing produce were placed therein. The loading platform furnished the only way by which merchandise could be placed in the cooling room and was also the work-ing place for defendant's employes while unloading bananas through the trap door into the basement below.

The cooler room itself contained green goods and all forms of perishable merchandise. It also served as a dis-play room. Customers in this line were permitted to ex-amine the goods in stock and to that purpose entered the cooler room through the door from the platform (having entered the loading platform through the door on its western side) and passing over the trap door in place to the entrance of the cooler room. No guard rail, gate, or other device gave notice of the existence and location of the trap door.

A customer desiring to examine the merchandise in the cooler room was accompanied by an employe. Passing from the office to the cooler room such employe and cus-tomer would necessarily pass through the wareroom, through the door immediately in front of the trap, over the trap to the loading platform and from it through the only door leading into the cooler.

On May 24, 1935, plaintiff's decedent came to the de-fendant's place of business. He met and conversed with the defendant in the office. When defendant engaged in a telephone conversation, Mr. Evans left the office. He went into the wareroom and is located by the witness, Kern, as standing at a point near the scales. There is evidence from which a jury might properly find that Mr. Evans and defendant discussed a proposed sale of a truck by Evans to Younkin and the matter of Younkin assist-

540

ing Evans in selling a truck to Davidson. There is also evidence from which a jury might properly find that Evans wished to examine the truck loaded with bananas and standing by the loading platform.

From all the evidence, the jury could properly find that the trap door in question was across a passageway in the place of business of defendant, which passageway was used by employes and customers in going from the office or main wareroom to the cooler, and that leaving the trap door open and thereby making a hole or drop in the passageway unguarded was an act of negligence.

The trial judge submitted the question of defendant's negligence to the jury on the theory that these circumstances constituted Evans an invitee upon the defendant's premises.

This hypothesis required the jury to determine whether the premises, as described, were in a reasonably safe condition for the uses and purposes of the invitation and so as not to expose the invitee to danger.

Defendant owed to plaintiff the affirmative duty of keeping his premises reasonably safe for business visitors and of giving warning of any failure to maintain them in that condition.

This rule has been frequently invoked by our Supreme Court. Perhaps the most recent reference thereto is found in Vetter v. Great Atlantic & Pacific Tea Co., 322 Pa. 449, 454:

"The appellee was lawfully on the premises as an invitee. Appellant owed him a duty to use due care for his protection and to keep the premises in a reasonably safe condition, for the uses and purposes of the invitation, so as not to expose appellee to danger. It is true that in cases such as the present the person in ownership or control of the property is not the insurer of the safety of the invitee; his duty is discharged by the exercise of reasonable care. To such effect we have declared the rule in several of our recent decisions. Mr. Justice Simpson, in *Nettis v. Gen.*

*Tire Co.*, 317 Pa. 204, 209, said: 'All the authorities agree that it is incumbent upon the owner of premises upon which persons come by invitation, express or implied, to maintain such premises in a reasonably safe condition for the contemplated uses thereof and the purposes for which the invitation was extended: *Newingham v. J. C. Blair Co.*, 232 Pa. 511; *Craig v. Riter-Conley Mfg. Co.*, 272 Pa. 219.' To the same effect we recently held in *Kulka v. Nemirovsky*, 314 Pa. 134, 139: 'Defendant owed to the plaintiff the affirmative duty of keeping his premises reasonably safe for business visitors, such as plaintiff, and of giving warning of any failure to maintain them in that condition: *Robb v. Niles-Bement-Pond Co.*, 269 Pa. 298; *Markman v. Bell Stores Co.*, 285 Pa. 378; *Newingham v. J. C. Blair Co.*, 232 Pa. 511; *Pauckner v. Wakem*, 231 Ill. 276; *Starcher v. So. Penn Oil Co.*, 81 W. Va. 587, 602; *Restatement, Torts*, section 332 (see comment a). Plaintiff was entitled to rely on defendant's performance of this duty: *Restatement*, section 343 (see comment d) ; *Yuhasz v. Pitt. Const. Co.*, 305 Pa. 166; *Adams v. Fields*, 308 Pa. 301, 305; *Blondin v. Oolitic Quarry Co.*, 11 Ind. App. 395; *Gobrecht v. Beckwith*, 82 N. H. 415.' "

After recalling to the jury the testimony offered as to the conditions heretofore described and after defining this rule, the trial judge submitted to the jury the question of defendant's compliance with this rule and performance of this duty.

We think the jury may properly have found from the evidence that Evans was on the premises on business with the invitation, or, at least, the consent of defendant, and that at least one item of his business consisted in making some examination of the truck at the loading platform, to reach which point he necessarily passed over the place where the trap door was open, without any guard or warning of this fact.

No complaint is made as to the form of submission. The contention is that there was no evidence justifying such submission. We have concluded that there was such testimony and that therefore there was no error in permitting the jury to determine the fact.

Placed first in the brief and urged with unusual emphasis is defendant's proposition that plaintiff is not entitled to recover because of the contributory negligence of her decedent.

In this respect, the law is plain. The facts are not so simple.

In the very recent case of Murphy v. Bernheim & Sons, Inc., 327 Pa. 285, we find, in the opinion of Mr. Justice Maxey, a clear statement of the law:

"A court will not declare a person guilty of contributory negligence unless the evidence of his negligence is clear and unmistakable. In *McCracken v. Curwensville Boro.*, 309 Pa. 98, 114, 163 A. 217, we quoted the following with approval from 26 R. C. L., pages 1067-69, sec. 75: 'It is an established principle that if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of either party in the trial of a case, the question must be left to the jury. . . . A verdict should not be directed if on all the facts and circumstances there is room for fair and sensible men to differ in their conclusions, or, as it is sometimes stated, [if] the evidence is not such that honest minds could reach but one conclusion.'

"We have also held that in determining whether or not the victim of an accident is guilty of contributory negligence it must be borne in mind that the victim had a right to assume within reasonable limits that the party whose negligence primarily caused the injury would perform his duty. In *Adams v. Fields*, 308 Pa. 301, 305, 162 A. 177, we cited with approval the following from 20 R. C. L., page 117, sec. 101: 'Everyone to whom a

duty is due has a right to assume that it will be performed.' "

With this plain rule in mind, let us examine the testimony bearing upon this question. The description of the premises as contained in the earlier paragraphs will suffice for this feature of the case.

We start with the fact that the victim of the injury is dead. There is thus in the case the presumption that he did his duty. There is no positive testimony that rebuts this presumption conclusively.

No one saw Mr. Evans fall through the trap door. The witness Kern stood within three feet of the opened trap. He was facing toward the south. Just before he opened the trap door and indeed while in the act of opening it, he says he saw Mr. Evans lighting his pipe near the scales. Evans was looking in his direction. After he placed strings on two bunches of bananas, he heard the call of Mr. Evans from the basement below. A very short time elapsed between these events. How Mr. Evans traversed the distance between the scales and the trap door and how he came to fall through that trap door was not observed by Kern. How it could happen without his seeing it happen does not seem conceivable, but such is the testimony.

The witness Craig had just come out of the cooler room, where he had been doing some work, passed over the trap door, conversed with Younkin and went out to find an assistant for Kern in unloading the bananas. When he returned, Evans was in the basement seriously injured.

Almost immediately after Younkin finished his telephone conversation, he heard Kern call to the effect that Evans had fallen through the trap door. None of them saw the fall. No one quotes Evans in describing the fall during his remaining days. It would seem that, without positive testimony to rebut the presumption, the court could not declare plaintiff's decedent guilty of contributory negligence as a matter of law.

There is, however, in addition to the presumption, evidence of circumstances which, in our judgment, compel submission to the jury. The trap door was between Evans and the truck which he wished to examine. He had a right to go by the ordinary course to the location of the truck. No sign warned him of the open door. No guard rail, fence, or other impediment surrounded the open space. The testimony is not clear, if not actually contradictory, on the question of light. As before noted, the size, quality, and intensity of the electric light bulb over the trap door is not described.

When Craig came out of the cooler, the light was not "on". Kern says he switched it on when he opened the trap door preparatory to unloading the truck.

Mrs. Evans quotes Younkin as saying, in the presence of Evans, in the Evans home, that Evans was right when he said that the light was not on because Kern did not know where the switch was located.

The absence of windows or other means of lighting the loading platform is to be noted. The fact that the truck loaded with bananas was backed into and occupied practically all the open space to the south of the loading platform may have obstructed any light from that source.

The light in the wareroom was certainly not turned on. The shadow of the man photographed in defendant's Exhibit A has significance as to the condition of illumination in that room at the time of the taking of this photograph.

It is apparent that both lights were on when this photograph was taken.

Kern, the only living witness, who was working in that room, does not describe the condition of illumination in that room. If the light was sufficient to be a guide to the footsteps of Evans, how did Kern fail to see him as he approached the hole and fell through it.

If the room was so dark as to bring plaintiff's decedent within the description of one walking in darkness and

therefore guilty of negligence, Kern must have known that fact. With all the emphasis placed upon the item of contributory negligence, defendant did not ask Kern to describe the condition of illumination in that room further than to elicit the fact that the light was on.

In a somewhat extended discussion of a question similar to this, Mr. Justice Maxey, in Murphy v. Bernheim & Sons, Inc., supra, says (p. 289) : "On the other hand, if the entrance is lighted, it may be argued that, if the intending passenger had exercised the care required of him, he would have discovered the danger. But between the extremes of darkness and lightness there is a middle degree of illumination. Where the elevator approach is but dimly lighted, a person may be justified in thinking that an elevator is at the floor when in fact it is absent. Under such circumstances, his contributory negligence is plainly a jury question."

The testimony disclosed that Evans had been in the place of business many times, had been a customer there on occasion, and was familiar with the fact that the trap door was open only when bananas were being put in the cellar. It may be, from what occurred in his presence, that he knew the help had not been procured to put bananas in the cellar at that time and felt safe in crossing the place where the trap door was, even though at that time it was unlighted.

In the light of the law and the facts as outlined in the case of Murphy v. Bernheim & Sons, supra, we are of the opinion that to declare plaintiff's decedent guilty of contributory negligence as a matter of law would be error. We resolve that question in favor of plaintiff.

On the third question, little need be said. Lay witnesses described the condition of Mr. Evans from day to day from the time he was injured until the time he died. Such testimony was competent, in fact necessary, because of the death of Dr. Coll, the attending physician during the intervening time.

Dr. Parent, called as an expert by plaintiff, was in the courtroom and heard the testimony referred to.

A hypothetical question, based on this testimony, was propounded to Dr. Parent. He was asked, and answered in the affirmative, the question whether he was able to express an opinion on whether or not the injuries to Mr. Evans on May 24th were the proximate cause of his death on October 9th. Having testified that he could express such a professional opinion, he was permitted to do so. He testified positively that in his professional opinion, John Lewis Evans died in October as a result of the injuries in May.

Doctors Johnson, Fosselman, and Newill, expert witnesses called in behalf of defendant, just as positively expressed the opinion that there was no causal connection between the injury in May and the death in October.

Dr. Coll certified to the Bureau of Vital Statistics at Harrisburg that Mr. Evans died of chronic endocarditis with decompensation and suppression.

Dr. Parent said that, while he would regard such a statement in the death certificate as describing one of the causes contributing to the death of Mr. Evans, he would not change his opinion as to the causal connection between the injury and the death.

While thus a strong line of expert testimony, when considered upon the basis of the number of witnesses, was produced in favor of defendant, there was still the conflict of testimony that had to be resolved by the fact-finding body.

The finding of the jury in that respect is not such as would compel a new trial, on the theory that the verdict is so against the weight of the evidence as to prevent a conscientious judgment on the verdict.

For the reasons stated in this opinion, we overrule and dismiss defendant's motion for judgment n. o. v. and also his motion for a new trial, in the following

*Order*

Now, March 7, 1938, upon and after consideration, defendant's motion for judgment n. o. v. and his motion for a new trial be and the same hereby are overruled and dismissed and the prothonotary is directed to enter judgment upon the verdict, upon payment of the jury fee.