## BASH v. BALTIMORE & O. R. CO.
### No. 6713.

Circuit Court of Appeals, Third Circuit.
Feb. 3, 1939.

Wm. M. Kahanowitz, of Greensburg, Pa., and Clarence B. Nixon, Harry J. Nesbit, and John B. Gordon, all of Pittsburgh, Pa., for appellant.

E. V. Buckley and Pugliese & Evans, all of Pittsburgh, Pa., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal presents the pathetic pattern of the grade crossing accident. A family's breadwinner going about his daily work (in this instance trucking coal) is snuffed out by the operation of a transportation system essential to his welfare (it carried the coal) and that of his fellow citizens. More than forty years ago, the Pennsylvania Supreme Court formulated the problem in these rather graphic phrases:

"The traveler on the public road, going at the rate of four or five miles an hour, cannot be seriously inconvenienced by the delay of a few seconds near the crossing. Therefore, the law holds that, while both have a right to the crossing, the right of the single traveler must be subordinate in this particular to that of the train. As both cannot have this limited space at the same time, he must wait until the train passes. Further, the law peremptorily enjoins upon each ordinary care in the enjoyment of the right. The train must signal to the traveler its approach to the crossing by the steam whistle. The traveler, as he hears it, must stop, look, and listen. The instinct of self-preservation should impel both to the exercise of this degree of care, but, aside from this, 'the law commands it.' Naturally, then, we would expect grade-crossing accidents to be of rare occurrence; but, contrary to our expectation, the records of the courts of the commonwealth demonstrate they are very frequent. We are driven, then, to the conclusion that the commonwealth, the power which by law authorizes the grade crossing, is negligent in her concern for the lives and property of her citizens. No experienced and humane railroad officer doubts this negligence. Every intelligent citizen admits and condemns it. Still this constant peril to life and limb continues to exist and increase. Each year a growing population importunately demands more railways and more public roads to meet the requirements of travel and traffic. Their construction is followed by more grade crossings; these, by more accidents; and these, by costly and vexatious lawsuits. While we have no desire to touch matters which the constitution confides to another branch of the government, judicial observation of an evil without adequate remedy, except by wholesome legislation, compels us to notice it." Newhard v. Pennsylvania R. Co., 153 Pa. 417, 421, 26 A. 105, 106, 19 L.R.A. 563.

Since then the "greatest good" has shifted its emphasis and the "greatest number", i. e., the users of the highways, have insisted upon the protection and elimination of crossings at grade (For Fewer and Safer Grade Crossings, The American City, March, 1929, p. 104; Stop, Look, and Listen!, The Forum and Century, October 1934, p. 239).

It will be noticed that we have quoted from a Pennsylvania case. That leads us to call attention to the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. This abandonment of Federal general law has occasioned some controversy among the theorists (Shulman, The Demise of Swift v. Tyson, 47 Yale L.J. 1336; McCormick and Hewins, The Collapse of "General" Law in the Federal Courts, 33 Ill.L.Rev. 126; Schmidt, Substantive Law Applied by Federal Courts— Effect of Erie R. Co. v. Tompkins, 16 Tex. L.Rev. 512; Schweppe, What Has Happened to Federal Jurisprudence?, 24 A.B. A.J. 421; Jackson, The Rise and Fall of Swift v. Tyson, 24 A.B.A.J. 609; Powell, The Constitutional Convention and Swift v. Tyson, 24 A.B.A.J. 862; Knightlinger, Swift v. Tyson Overruled, 13 Ind.L.J. 564; Fraenkel, Constitutional Issues in the Supreme Court 1937 Term, 87 U.Pa.L.R. 50; Stimson, Swift v. Tyson—What Remains?, Cornell Law Quarterly, December 1938, 54). Ours is, of course, not to reason why. The same is true of the bar and we speak of it here because counsel for the appellant relies on one of our own cases. Perucca v. Baltimore & Ohio R. Co., 3 Cir., 35 F.2d 113.

The rulings of the courts have been shaped to supplement this mechanical avoidance of accident. The writer of this opinion happened to be on the bench of the District Court at the time of the pronouncement of the dictum in the case of Baltimore & Ohio R. Co. v. Goodman, 275 U.S. 66, 70, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645 (opinion by Holmes, J., in the early years of whose distinguished life, the horse and buggy were most certainly a feature). He remembers the attendant legal excitement and the rash of articles in law reviews. The best of them are collected in note 1 of the discussion in 15 Cornell Law Quarterly 136. Whether these judicial shapings have accomplished their purpose may be debatable. For instance, the learned writer of the article above cited and the former and learned Chief Justice of Pennsylvania are not in complete agreement.

"It is not unreasonable to require, as the Goodman case does, that at an obstructed crossing a motorist come to a full stop, and if necessary get out of his car to determine the approach of danger. Careful motorists would tend to do so anyway;

knowledge that the courts require this caution is the catalytic agent making their conduct conform to the rule. But when we set up requirements that are too stringent, and out of touch with highway practices, common experience would indicate that motorists will refuse to obey these strictures. Pennsylvania perhaps presents an example of standards that are too exacting." Glushien, Torts: Contributory negligence: Duty of traveler crossing railroad tracks, (Notes and Comments) 15 Cornell Law Quarterly 136, 139.

"There is much more room to quarrel with the 'stop, look and listen' rule, itself, as an encroachment on the rights of the jury, than with the rule in the Carroll Case; but the former is now so ingrained in our law that it has become a rule of thumb, and its discussion at this time is of no practical use. It can, however, be said in its favor that the 'stop, look and listen' rule has filled a real purpose and saved many lives, which probably accounts for its continued existence; and, as stated before, the rule in the Carroll Case is but a logical application thereof." Trial by Jury, 2d Ed., von Moschzisker, Sec. 321.

The solution may belong in the legislative department. Minn.Stat.Mason's 1927, c. 28, § 4743-1 et seq. Cf. Matson, Experience with the Minnesota Grade Crossing Stop Law, 36 Am.City 478.

Furthermore the greater the departure from the general to the particular standard, the greater the complexity of application for the trial court and the greater the opportunity for appealable error. According to Professors Morgan and Farley, we are unlikely to have the compensation of understanding and acceptance by a jury of the guidance offered.

"No extended experience at the bar or upon the trial bench is required to produce a vivid realization that only in the exceptional case is the jury decisively influenced by the judge's instructions." Morgan, Instructing the Jury Upon Presumptions and Burden of Proof, 47 Harvard Law Review 59.

"The original purpose of giving instructions for the actual enlightenment of the jury, to assist them in applying the law to the facts, has become inconsequential. The priests, however, are not fooled by the system evolved. The lawyers and judges are perfectly aware that juries pay scant attention to the type of instructions commonly given them on the law appli-

cable to the facts, and that as a rule they are incapable of the fine discrimination such an application requires. But it is impressive to the public and it clothes the jurors with a sanctimonious mantle of enlightenment which gives them a sense of peace and accord with authority. Trial lawyers may consume a great deal of time on instructions, but little of it is wasted on attempting to force the jury's attention to them. It is usually as futile as reading a decision of the supreme court to a justice of the peace or arguing the Constitution with a policeman." Farley, Instructions to Juries—Their Role in the Judicial Process, 42 Yale Law Journal 194, 213-214.

In the case at bar we do not reach the legal intricacies of the "stop, look, and listen" rule. Another and simpler principle halts us on its threshold. This is the so-called Incontrovertible Physical Facts Rule (10 R.C.L. sec. 198, p. 1009; Words and Phrases, Fourth Series, Incontrovertible, p. 314).

Truth is as much of the essence of the court as of the laboratory. The distillation of that essence is from an uncertain, because human, rather than from a certain, because chemical, element. To put it another way, the human and the mathematical equation are not the same. A principal test tube of the courts carries the legal encyclical—credibility of witnesses.

"The simple believeth every word; but the prudent man looketh well to his going." Prov. xix. 15.

"It is a wild conceit that any court of justice is bound by mere swearing; it is the swearing credibly that is to conclude its judgment." Lord Stowell, The Odin, 1 C.Rob. 248, 252.

"The causes of trustworthiness and untrustworthiness in evidence will probably without much difficulty be acknowledged to be an interesting pursuit; interesting not merely as a field of speculation, but with a view to practice." Jeremy Bentham, Rationale of Judicial Evidence, Bk. I, chap. ix.

The necessity for and yet the inadequacy in the application of this touchstone is common experience to all triers of the facts, be they judges or be they juries. To the student, the pertinent headings of Professor Wigmore's monumental work on Judicial Proof are revealing.

"Part II, Title III. The Interpretation of Specific Testimony to Establish the Extent and Sources of Error

"Subtitle A: Extent of Latent Error in the Normal Testimonial Process

"Subtitle B: Extent and Sources of Error as Indicated by Some Common Testimonial Incidents

"Topic 1 Defective Basis of Perception

"Topic 2 Incomplete Recollection

\*     \*     \*     \*     \*     \*

"Subtitle C: Sundry Illustrations of the Fallibility of Testimony."

The headings quoted might be amplified by others less tender of mortal ethics. An earlier writer on the same subject is Ram, and Chapters X and XIII, Of the Credit of a Witness and Of Conclusion from Facts, in his book, A Treatise on Facts as Subjects of Inquiry by a Jury, emphasize our thought.

From the foregoing, it is clear that any field of cooperation between the courts and the laboratory is Elysian to the former. Such cooperation might be said to reach its apogee in the Physical Facts Rule. This appears in expressions in its ratio decidendi as applied to the situation under scrutiny.

"Assertion of Looking and Listening at Railroad Crossing.—Courts are not so deaf to the voice of nature, or so blind to the law of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value simply because of its utterance. A court will treat that as unsaid by a witness which, in the very nature of things, could not be as said." Moore, A Treatise on Facts or the Weight and Value of Evidence, Vol. 1, 204.

"Traveller Looking without Seeing where View is Unobstructed.—This brings us to the question whether the law will tolerate the absurdity or fraud of allowing the traveller to prove that he looked but did not see the train; where the view was unobstructed, and where, if he had looked, he must have seen it. The law will tolerate no such nonsense. If the position of the traveller, with respect to the approaching train, was such that he must have seen it if he had looked, or heard it if he had listened, the law will conclusively presume that he neither looked nor listened, or else that, having perceived it coming, he thrust himself in front of it and took his chances of getting

across ahead of it." Thompson, Commentaries on the Law of Negligence in all Relations, 341, 342.

Some of the cases and therefore some of the text writers (or should this be vice versa) place the rule in an aspect beyond the requirements of its application to the case at bar. They make it part of a wider and perhaps less valid principle and phrase it either as Incredibilities and Improbabilities (Moore, A Treatise on Facts, above cited, Chapter IV, p. 179) or Withdrawal of Unreasonable Testimony from Consideration of Jury (15 Ann.Cases, note page 1187; Ann.Cas.1917B, note page 473). See also Kelly v. Jones, 290 Ill. 375, 125 N.E. 334, 8 A.L.R. 796; Seiwell v. Hines, 273 Pa. 259, 116 A. 919, 21 A.L.R. 141. Professor Wigmore, whose logical mind does not permit of any distinction between different kinds of triers of the facts (Wigmore, A Program for the Trial of Jury Trials, 12 Journal of the American Judicature Society 166), has expressed skepticism (Wigmore on Evidence, Section 662, Scientific Improbabilities). The controversy rather reminds us of the Savoyard:

"Of that there is no possible doubt,
No possible probable shadow of doubt,
No possible doubt whatever."
                            The Gondoliers.

The factual impossibility of the principal case is not complicated. The plaintiff's witnesses are two boys (19 and 15), friends and "fellow travellers" on this occasion of the plaintiff's intestate; the driver of a following (at a distance of 175 yards) truck; two employees of a brewery at the crossing; one employee of the coal tipple; and a surveyor.

The story they relate is this. The truck was driven by the plaintiff's intestate, a man twenty-nine years of age, who was thoroughly familiar with the crossing. It stopped between 6 and 10 feet from the crossing, at 9:30 in the morning. The older boy looked to his right (the direction from which the fatal freight came) through the unopened (and possibly clouded) window of the truck's cab, saw no train, advised the decedent driver to proceed; he did proceed and they were struck as they entered upon the second or west bound track. The train speed estimated was 60 miles per hour. The left-hand window of the cab was open and the brewery was silent.

The facts upon the relevant laws of physics (optics and acoustics) are these.

The road along which the truck proceeded parallels the railroad from its loading place to the crossing, a distance of one-quarter mile. Both road and rails follow a "fairly light" curve. The only obstruction, a car in a siding not definitely located, was beyond the west bound track. The day was clear and the only noise was that of a motor in low gear and of a 40 car loaded freight train. We do not touch upon the strong reinforcement of these physical facts by the defendant's witnesses.

In our view, the impossibility of plaintiff's theory of the accident is implicit in the narration of her own witnesses. The train must have been both visible and audible if and when the truck stopped at the crossing.

"Things in motion sooner catch the eye
Than what not stirs."
Troilus and Cressida, A. iii, S. 3.

More than that, a freight of the character indicated must have been audible while the truck was proceeding along the parallel road before the crossing angle was reached.

The question being by definition, factual, citation of authority is illustrative rather than enlightening. The cases are collected in the notes and text books we have referred to and in the West System (20 Century Digest, Evidence, § 2437; Decennial Digest, Evidence, ☞588 of Volumes 8, 10, 12, and 13 of the First, Second, Third and Fourth Series respectively). The leading case in Pennsylvania is Carroll v. Pennsylvania Railroad Company, 2 Penny., Pa., 159, 12 Wkly. Notes Cas. 348, in which, in a brief per curiam opinion, the Supreme Court of that state said:

"The injury received by the plaintiff was attributable solely to his own gross carelessness. It is in vain for a man to say that he looked and listened if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive."

And see also von Moschzisker, Trial by Jury, 2d Ed., above cited, sections 319 and 320. The cases applying the rule have multiplied to an extent requiring a separate digest subhead, "Physical Facts and Testimony Inherently Improbable", under Credibility of Witnesses. In the Fourth Decennial Digest, twenty-three out of the one hundred and one cases cited thereunder are from Pennsylvania.

The judiciary, in such opinions as we have examined, seem unaware of the

existence of a text book devoted largely to the subject. In Moore, A Treatise. on Facts, above cited, Chapters 5 and 6, entitled, Sound and Hearing, Light and Sight, the learned author makes a painstaking . analysis of the various significant factual situations. In the former, 29 paragraphs, and in the latter, 25 paragraphs, are devoted to particular sets of circumstance. Their detailed character is apparent from such headings as Noise of Vehicle Preventing Hearing Locomotive Signals and Experiments Showing Visibility of Railroad Train. (See also sections 148, 150 and 191 of the same book.)

The judgment entered on the verdict in favor of the defendant and against the plaintiff is hereby affirmed.