## REEVES v. PHILADELPHIA IMPORT CO.

### No. 8476.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 21, 1944.

Decided May 12, 1944.

Richard A. Smith, of Philadelphia, Pa. (Louis Wagner and Stephen J. McEwen, both of Philadelphia, Pa., on the brief), for appellant.

Herbert A. Barton, of Philadelphia, Pa. (C. Donald Shwartz and Swartz, Campbell & Henry, all of Philadelphia, Pa., on the brief), for appellee.

Before JONES and McLAUGHLIN, Circuit Judges and KALODNER, District Judge.

## McLAUGHLIN, Circuit Judge.

This is an appeal from a plaintiff's judgment, the result of a personal injury negligence action. The accident occurred in Philadelphia, with the suit started and tried in the Eastern District of Pennsylvania. The case is in the United States Courts because of diversity of citizenship. The law applicable is that of Pennsylvania. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

The plaintiff was a man about thirty-nine years old at the time of the accident involved here. He was employed by a lumber company, in loading and unloading its trucks. He had been with the same concern about twenty-one years. On June 10, 1940, he brought a load of planks to the defendant's mill in the City of Philadelphia, for the purpose of having them planed, tongued and grooved. He left the planks at the rear of the planer, made another stop in the yard to get some different type of lumber, and then brought his truck around to the front of the planer for the loading of the dressed lumber upon it.

Plaintiff backed his truck against the loading platform, which really consisted of a conveyor belt on which the lumber continued after leaving the planer. The back of the truck was close to the front of the conveyor belt. Plaintiff, on his own behalf, testified that the only thing he was told by defendant's employees was to go around "and back up to the planer." He said no one offered to help him. As the lumber came off the conveyor, plaintiff arranged it on his truck. He had all the lumber aboard except three or four pieces before the accident happened. In his testimony he described the accident as follows:

"A. One [piece of lumber] came out and I picked it up, started to roll it to the west side of the truck. By the time I came there another one hooked on and it buckled and hit me and knocked me to the ground.

"Q. Where were you when this piece came out? In what position were you? A. I was just turning around to get another one when another one hit me.

"The Court: And knocked you to the ground from the truck?

"The Witness: From the truck.

"The Court: From the truck?

"The Witness: Yes."

He described the buckling as being caused by the plank then coming off the conveyor striking the end of a plank already on the truck. Earlier in Reeves' testimony, asked to describe what he saw defendant's employees do in the operation of the planer, he replied, "I just saw them feed the machine, that is right, feeding too fast so I couldn't get it away." He also said regarding prior visits to defendant's place of business, "On other occasions, whenever I went there, I always picked the stuff off the ground. It was all done waiting for me."

The foreman of the defendant was a witness on the latter's behalf. He said

that he told the plaintiff to go around in the back of the mill and get the lumber. He testified that there is a handle on the planer which, when pulled toward the operator, stops the movement of the planks immediately. The person who fed the lumber into the conveyor was a defense witness. He said that from his position if he leaned toward his left side he could see the truck. With reference to the necessity of him observing plaintiff, there is the following testimony by him:

"Q. You say when you leaned over to your left side—did you look out there from time to time? A. Yes, sir; I had to.

"Q. When was the last time you looked out—what piece was going through? A. I guess about the thirty-fourth or thirty-fifth.

"The Court: He used the expression there, 'Yes, sir; I had to.' What do you mean you had to?

"The Witness: Why, you got to watch the man at the truck every once in a while.

"The Court: Watch the man at the truck?

"The Witness: Watch out there—see how things go; yes, sir."

This man did not see the accident. The last time he looked toward the truck was when he had about four or five pieces left to put into the planer. He had no idea how much lumber was on the truck but did admit that the pile was going up. Asked whether he could see that it was going up higher than the conveyor, he replied, "If you want to you could look out and see it."

One Frank Bell was a witness for the defense. He was playing ball alongside the planing mill and said that he could see the plaintiff working. He said further, "Just out of the tail of my eye, I could see that there was work going on and all. I saw him lose his balance and fling his arms up and go off the side of the truck backwards, towards me." Asked if he saw any planks buckling, he said, "I saw no activating force at all, as far as pushing him off the truck was concerned."

Uhlman, the foreman, also testified that he saw Reeves after the accident and that with reference as to how the accident happened, Reeves' answer to him was, "Why he just says that he fell off of the truck." Asked if Reeves said anything about any timbers buckling, Uhlman said, "Not at the time." Uhlman also said that at the time he told Reeves to go around in back

of the mill and get the lumber, he offered help and Reeves refused it.

 The above is substantially the fact testimony in the case. Plaintiff was a business invitee on the defendant's premises and entitled to reasonable care. Nettis v. General Tire Co. of Philadelphia, 317 Pa. 204, 177 A. 39; Newingham v. J. C. Blair Co., 232 Pa. 511, 81 A. 556; Robb v. Niles-Bement-Pond Co., 269 Pa. 298, 112 A. 459. It seems to us that whether the defendant here exercised such care was a question of fact for the jury. Reeves, although he had been at the defendant's plant before the accident, had never before actually loaded lumber on to his truck direct from the conveyor. According to his testimony, he was busily engaged in stacking the lumber and as he turned around from the piece he was then handling, the incoming plank struck the rear end of a timber already on the truck which resulted in the buckling process. There is some indication from Reeves' evidence that the defendant's employees were feeding the machine too fast for him to properly handle the plank which caused the buckling. There is direct testimony by the operator of the machine that it was necessary for him to watch the man at the truck every once in a while; and the foreman states that the machine could have been stopped immediately by using the control. There are various conflicts in the evidence, but all these resolve themselves into questions of fact, passed upon by the jury. Nor do we see that the testimony as to the facts, upon which the verdict is based, is so inherently improbable as to bring it within the scope of the doctrine illustrated by Bash v. Baltimore & Ohio R. Co., 3 Cir., 102 F.2d 48, Lessig v. Reading Transit & Light Co., 270 Pa. 299, 302, 113 A. 381.

 Appellant questions the hospital and medical bills totaling $765, on the ground that they were voluntarily paid by the workmen's compensation insurance carrier of the employer of the plaintiff. The appellant alleges that the carrier was only legally liable for $100 of this amount under the New Jersey Workmen's Compensation Act, N.J.S.A. 34:15–1 et seq. The statutory limitation of responsibility under certain conditions is for its protection, representing the employer. The hospitalization and medical treatment indicated by the bills seem to have been accepted by such carrier as necessary and

reasonable. There was no objection urged at the trial below by the defendant as to the reasonableness of the amounts of the bills.

 On the question of plaintiff recovering for wages. The court did charge that, "He is entitled to the loss of earnings." Just prior to that reference he had discussed this item in connection with plaintiff's out-of-pocket expenses. The court told the jury that regarding that testimony "* * * your recollection and your judgment there will be controlling. You will find out what his actual expenses were, based upon the testimony, * * *." The evidence concerning plaintiff's earnings during the period he was laid up is rather confusing. Part of whatever he received seems to have come from compensation payments; part from payment by his employer; and part from what seems to be a contribution by the employer. The jury had the benefit of such testimony as there was on this subject and under the court's instruction was to be guided by that testimony.

Appellant next suggests that the verdict of $10,000 is excessive. The accident happened June 10, 1940. Plaintiff had three vertebrae fractured; one of which, the eighth dorsal, sustained a crushed fracture with a wedge shape. Plaintiff was in the hospital four months. Leaving the hospital, he wore a metal brace on his back for a year after that. It was not until after January 1, 1942, that he resumed his regular work. He still has end results of the injury which are referred to in the discussion on the next point. There were considerable hospital and medical expenses and, as stated, a perplexing question as to loss of wages. Even without these special damage items, we do not see that the amount arrived at by the jury is so excessive as to warrant interference by this court.

Appellant objects to what the court said in the charge with reference to plaintiff's loss of earning power. The defendant excepted to this on the ground that there was no evidence of the loss of earning power and no issue on this to be submitted to the jury. It now urges that there was no such evidence and the jury verdict for such is entirely conjectural.

It seems to us that the trial court's language on this point was justified by the testimony. The evidence as to plaintiff's injuries is as above outlined. The medical testimony is that the plaintiff has sustained a definite permanent injury. While there has been a bony healing of the fractures, particularly that of the eighth dorsal, Dr. Longsdorf said that there will always be a slight deformity. He states the plaintiff has been suffering ever since the accident from some degree of insomnia. He thinks that there has also been a thickening and hardening of the cartilaginous tissue between the vertebrae and this causes a little nerve irritation. There was obviously an impairment of plaintiff's earning power due to this accident, and the court, rightly, left it to the jury for the latter to say how much this amounted to.

Appellant's last point is that the trial court in allowing plaintiff's third and fourth points for charge fixes the defendant as an insurer. A reading of the points as charged shows this to be without merit.

Affirmed.